Clarence D. Hawkins v. Commissioner.
Hawkins v. Commissioner
Docket No. 23135.
United States Tax Court
T.C. Memo 1955-110; 1955 Tax Ct. Memo LEXIS 229; 14 T.C.M. (CCH) 382; T.C.M. (RIA) 55110; April 29, 1955
Lee S. Jones, Esq., 920 Kentucky Home Life Building, Louisville 2, Ky., and James T. Robertson, Esq., for the petitioner. William R. Bagby, Esq., for the respondent. TURNER Memorandum Findings of Fact and Opinion TURNER, Judge: The respondent determined deficiencies in income tax against the petitioner for the years 1942, 1943, 1944 and 1945 in the respective amounts of $2,296.51, $3,546.38, $12,660.99 and $16,603.17, and additions to tax for fraud with intent to evade tax, for such years, in the respective amounts of $1,148.26, $1,690.29, [1] $6,330.50 and $8,301.59. *230 The questions presented are (1) whether respondent erred in using the net worth and expenditure method to compute petitioner's net income; (2) whether petitioner had cash on hand of $49,000, or any amount, which respondent did not take into account at the beginning of the net worth period; (3) whether petitioner had cash on hand of $9,300 at December 31, 1945; (4) whether respondent correctly computed petitioner's depreciation for each of the years in question; (5) whether the period within which respondent might assess and collect any of the deficiencies herein has expired under the provisions of the Internal Revenue Code of 1939; and (6) if there are deficiencies in tax, whether any parts thereof were due to fraud with intent to evade tax. Findings of Fact Some of the facts have been stipulated and are found as stipulated. Petitioner is a resident of Louisville, Kentucky. He filed his income tax returns for the years involved with the collector of internal *231 revenue for the district of Kentucky. Petitioner is a doctor of medicine and has been engaged in the practice of medicine continuously since 1914. He graduated from the University of Louisville Medical College and received his license to practice medicine in Kentucky in that year. In 1915 he took a position as an assistant to a doctor in mining work in Minnesota, but did not acquire a license to practice in that state. He later moved to Michigan, and in 1917, was granted a license to practice in that state. In addition to his work for the lumber From 1917 to 1923, petitioner was employed as company physician for Charles Hebard & Sons, Inc., a lumber company in Pequaming, Michigan, which operated several logging camps, a sawmill, a lathe mill and a shingle mill. Pequaming was located on Lake Superior, and, at that time, was a town of about 400 to 600 population. Petitioner had a contract with the lumber company, under which he was to provide all medical services for its employees and for which, in addition to being furnished an office, a house and all utilities, free of charge, he was to receive from the company $2.50 per month per married man and family and $1.10 per month per *232 single man, in town, and 85 cents per month per man for the men in the lumber camps. Petitioner was to provide medical supplies up to $300 a year; the costs of medical supplies in excess of that amount were to be paid by the company. The number of employees with the lumber company during the years that petitioner was with the company varied from a low of about 200 in the winter, to a high of 400 in the summer, with an average of around 225. company, petitioner during those years also maintained a private office in L'Anse, Michigan, a town of about 2,500 population, located nine miles from Pequaming, where he kept office hours daily. Petitioner was also Government contract physician for the Indian Agency, which paid him $720 a year, and for four or five years during the time he was in Michigan, he was contract physician for the Baraga County Poor Commission, which paid him $400 a year. In 1923 the lumber company was sold and petitioner left its employ, and moved from Pequaming to L'Anse, where he continued his private practice. In that same year, together with a friend named Beesley, as a partner, he purchased a hardware store in L'Anse for $3,000. Petitioner contributed $1,850, which *233 he had borrowed from a bank, and Beesley contributed $1,250 in cash, $3,000 of which was used to purchase the business. Beesley received $100 a month for his services as active manager of the store, and for the last two years of the partnership drew, in addition, $80 and some cents a month from partnership profits. Petitioner drew $100 a month from the partnership's profits during the last two years of the partnership. In the spring of 1927 petitioner sold his interest in the partnership for $6,000, of which $5,000 was paid in cash and the balance was a $1,000 bond. Petitioner also sold the purchaser of his partnership interest a lot for $800. Petitioner contracted tuberculosis in June of 1924, and was confined to his bed for eleven or twelve weeks. In the fall of 1924, he went to Florida to convalesce, returning to Michigan the following May or June. As a result of this illness and his trip to Florida, he lost much of his private practice in L'Anse, but another doctor, with whom he exchanged work, looked after his Indian Agency and Poor Farm contracts, so they continued to run. While petitioner was in Florida, he invested $4,000 or $5,000 in Florida real estate, some of which *234 he subsequently sold and some of which was sold for taxes in 1925 and 1927. Of this Florida property, he sold a house for $1,000, one lot for $950, and another lot for $375, or a total of $2,325, which is all he ever received back on his $4,000 to $5,000 investment. Petitioner filed no income tax returns for the years 1914 to 1920, inclusive; he filed a return showing no tax due for the year 1921, with the collector of internal revenue at Grand Rapids, Michigan, and filed returns with the same collector for the years 1922 to 1926, inclusive, which stated income taxes in the following amounts: Year
Amount
1922
$25.28
1923
84.88
1924
8.07
1925
38.94
1926
.26
Around 1926 or 1927, petitioner purchased his family's Indiana farm from a brother and sister for $3,000, paying $1,500 to each. Petitioner moved from Michigan to Louisville, Kentucky, in the fall of 1927. His furniture and office equipment were sent down on a truck which he owned, and he and his wife drove to Louisville in a new Buick automobile which he had purchased that year for $2,400 in cash. On December 9, 1927, he leased a residence at 4023 West Chestnut Street (or River Park Drive), in Louisville, *235 and set up his office for the general practice of medicine at 34th and Market Streets. From 1927, when petitioner moved to Louisville, up to and including the taxable years here in question, he was engaged in the practice of medicine in that city. Petitioner's medical practice was varied: He practiced obstetrics, performed tonsillectomies, and also administered anesthetics at hospitals, but the bulk of his work consisted of the general practice of medicine at his office and in the homes of his patients, and a substantial amount of this practice appears to have been confined to administering various types of injections. Many of petitioner's patients lived in the immediate neighborhood of his office, but he had many other patients throughout the city of Louisville. His fees for obstetrical services ranged from $50 to $75; his tonsillectomy fees were from $35 to $50, and his anesthesia fees were $10; office calls ranged from $1 to $3 a visit, house calls from to $5, and night calls were $5. On May 12, 1928, petitioner borrowed $408 from the Metropolitan Life Insurance Company on a life insurance policy which had been issued to him by that company on July 6, 1920. Unpaid interest on *236 this loan for the years 1929, 1930 and 1931 was added to the principal of the loan, which increased the amount due at July 6, 1931, to $485.94. On November 5, 1931, petitioner made a new loan for $655 on this policy, which amount incorporated the $485.94 owing on the prior loan. After deduction of the amount of the first loan, current interest thereon, and interest on the new loan, petitioner received $133.15. Two additional loans were made against this policy, on August 22, 1932, and August 8, 1934, to cover premium payments then due. As a result of these additional loans and the accumulated unpaid interest, which was added to the principal of the loan, there was owing a total of $1,289.76 on July 2, 1942. On that date petitioner paid both the loan and the interest in full. On July 13, 1928, petitioner borrowed $425 on another policy which he held with the Metropolitan Life Insurance Company, which had been issued to him on July 5, 1921. Petitioner paid no interest on this loan for the years 1930 and 1931, and such unpaid interest, which was added to the principal of the loan, brought the total amount owing at July 5, 1931, to $477.53. On November 5, 1931, the same day he borrowed *237 on his other policy with Metropolitan, petitioner made another loan against this policy in the amount of $616, which included the amount of the prior loan and interest thereon of $477.53. After deduction of the amount of the old loan and the current interest thereon, together with the interest on the new loan, the amount which petitioner received was $104.31. Additional loans were also made against this policy on August 24, 1932, and August 8, 1934, to cover premium payments then due. The additional loans and accumulated unpaid interest raised the total amount due on February 5, 1942, to $1,278.34. Petitioner paid the loan in full on that date. On December 19, 1927, petitioner rented a safe deposit box at the Kentucky Trust Company, for which he paid an annual rental of $3 for five years; he made his last payment on February 1, 1932. Petitioner entered the safe deposit box on the following dates: December 27, 1927
July 3, 1928
January 4, 1928
September 21, 1928
January 12, 1928
November 13, 1928
February 23, 1928
January 10, 1929
March 1, 1928
September 6, 1929
March 27, 1928
January 6, 1930
May 2, 1928
February 1, 1932
On April 25, 1939, the Kentucky *238 Trust Company forcibly opened this safe deposit box for nonpayment of rent, there then being $21 due in back rent, plus $2.10 in Federal taxes. The contents of the box when it was opened were worthless, and were as follows: Three deeds, dated January 19, 1925, January 24, 1925, and March 3, 1925, to real estate in Melbourne, Florida; a deed dated August 16, 1927, to real estate in India-Lantic By-the-Sea, Florida; two stock certificates of 25 shares each of the Flint Motor Company; a tax bill from the City of Melbourne, Florida, dated March 29, 1927, and a memorandum; a quitclaim deed dated December 28, 1927, to real estate in Jackson County, Indiana; a lease dated December 9, 1927, for property at 4023 West Chestnut Street, Louisville; copies of safekeeping department receipts of the bank in L'Anse, dated March 15, 1926, and March 14, 1927. On September 19, 1929, petitioner purchased a large house on a corner lot located at 3603 West Market Street, in Louisville, for $12,059.18, and moved his residence and his office there in that year. No part of the purchase price was paid by petitioner with cash; he traded his family farm to the seller, for which he received a credit of $3,000; *239 assumed a first mortgage of $7,412.20 at the Louisville Trust Company; assumed a second mortgage of $800 at the Central Mortgage Company; and assumed a street warrant of $846.98, making a total of $12,059.18. The property had been damaged by fire before petitioner acquired it, and as a result of this, he had to make some repairs. Between October 9, 1929, and December 3, 1929, petitioner purchased from Jacob Levy & Bros. lumber and building materials which were used for such repairs in the amount of $563.25, of which he paid $247.60, leaving a balance due and unpaid of $315.65. On December 31, 1929, Levy Bros. secured a mechanic's and materialman's lien on the Market Street property. On the same date, petitioner executed a mortgage to Levy Bros. to secure the payment of the unpaid balance, under the terms of which petitioner agreed to pay the balance due in monthly installments. This mortgage was released on August 20, 1930. On September 2, 1930, petitioner refinanced the mortgage indebtedness on the Market Street property at the Louisville Trust Company. The new mortgage was in the amount of $9,000, and provided for monthly payments of $104.40, beginning October 2, 1930, which payments *240 included interest, service charges and principal. The first nine payments from October 30 to June 1931, although late, were paid within the month due. The tenth payment, due July 2, 1931, was not paid until August 20, 1931, and the eleventh, twelfth, thirteenth, fourteenth and fifteenth payments were likewise paid about a month and a half late. The sixteenth and seventeenth payments were over two months late. On May 5, 1932, the Louisville Trust Company reduced the payments to $75 a month for six months, and petitioner made the eighteenth, nineteenth, twentieth and twenty-first payments in this amount. Each of these payments was likewise over two months late. The twenty-first payment, made on September 15, 1932, was the last monthly payment ever made to the Louisville Trust Company by the petitioner. The Trust Company paid taxes on the property for petitioner on July 7, 1932, in the amount of $119.37. Petitioner repaid the Trust Company $59.37 of this amount on July 13, 1932, and the balance was paid on February 19, 1934, when the balance of $8,663.13 of the obligation was paid by the Home Owners' Loan Corporation, hereinafter referred to as HOLC. During the existence of petitioner's *241 mortgage with the Louisville Trust Company, it had occasion to write him the following letters: "Clarence D. Hawkins, "April 18, 1931 3402 W. Market St., [3603 W. Market St.,] Louisville, Ky.
"Dear Sir: "We received today check for $104.40 representing payment which was due on the second day of April on Mortgage Loan No. 1598. This payment was assessed a fine of $3.60, and we will thank you to let us have your check covering same. "Very truly yours, THE LOUISVILLE TRUST COMPANY, By Fidelity & Columbia Trust Co., Receiver"
FG:FR "January 6, 1933 "Mr. Clarence D. Hawkins, 3402 W. Market Street, [3603 W. Market St.,] Louisville, Kentucky
"Dear Mr. Hawkins: "On referring to our records we find that your loan is three months in arrears. "Your payments are due on the second day of the month, and as this company cannot carry mortgages that are permitted to remain as much as ninety days in arrears, we must insist that you make provision immediately for the payment of these three months. Under no consideration can we carry this loan unless it is brought up to date. "Let us hear from you immediately, enclosing your check for the three payments at $75.00 each. "Very *242 truly yours, Secretary" FWG:L "January 2, 1934 "Mr. Clarence D. Hawkins 3602 W. Market Street [3603 W. Market Street] "Dear Sir: "We have a mortgage on your property at 3603 West Market Street. During the year 1933 you let this loan get in very bad shape. You have made us only two small payments in that time. We have now reached a point where this loan must be put in shape or it will be necessary for us to file suit and foreclose our lien. "If you care to save this property, please call at our office this week, so that we can discuss this matter with you. "Very truly yours, THE LOUISVILLE TRUST COMPANY By Mortgage Loan Department" AG:HF The mortgage on petitioner's property at 3603 West Market Street was refinanced with HOLC on February 19, 1934, in the amount of $8,963.81, for which petitioner executed a note and a new mortgage on the property to that corporation. At the time petitioner refinanced the mortgage with HOLC, he had paid $889.34 in interest and $148,23 in service charges on the prior mortgage with the Louisville Trust Company, and was behind $585.21 in interest payments and $92.96 in service charges. The HOLC paid the back interest and service charges *243 which were due, and incorporated those amounts as a part of petitioner's debt to that corporation. The indebtedness was to be paid in monthly installments over a period of fifteen years. Payments to June 1936 were to be only for interest in the amount of $37.35 each, after which the payments were to be in monthly installments of $82.91. In April 1939, petitioner began making payments of $50 in excess of the required monthly installments; as a result of this acceleration in his payments, petitioner paid off the mortgage in full on June 7, 1944, with a final payment of $92.04. At December 31 of the years 1938 to 1943, inclusive, petitioner owed the HOLC the following amounts on the mortgage loan: Year
Amount
1938
$7,469.39
1939
6,372.71
1940
5,057.71
1941
3,682.30
1942
2,243.69
1943
738.97
The house at 3603 West Market Street was quite large. Petitioner had his office in the basement, his home on the first floor, and apartments in the rear of the building, which he rented. For the years 1942, 1943, 1944 and 1945, petitioner's returns showed rent received from these apartments of $1,290, $1,290, $1,240 and $1,240, respectively. During the years 1934 to *244 1938 petitioner was granted four small loans by the Security Bank which were renewed from time to time. The record of these loans, for which the petitioner was required to have endorsers or collateral, was as follows: Date
Amount
Maturity
Payments
Date Paid
1. 6/21/34
$100.00
8/20/34
$100.00
8/20/34
8/2/34
75.00
10/19/34
11.00
10/20/34
64.00
10/22/34
10/22/34
65.00
12/18/34
65.00
12/20/34
12/20/34
65.00
2/16/35
16.00
2/19/35
49.00
2/20/35
2/20/35
50.00
4/16/35
50.00
4/16/35
2. 8/ 1/35
200.00
10/30/35
200.00
11/ 1/35
11/ 1/35
150.00
1/28/36
150.00
1/29/36
1/29/36
100.00
4/27/36
1.50
4/27/36
98.50
4/29/36
4/29/36
100.00
7/27/36
100.00
5/15/36
3. 8/20/36
150.00
11/16/36
150.00
11/20/36
11/20/36
150.00
2/15/37
150.00
2/19/37
2/19/37
100.00
5/17/37
100.00
5/27/37
4. 6/26/37
300.00
9/24/37
4.50
9/24/37
295.50
9/27/37
9/27/37
300.00
12/23/37
300.00
12/28/37
12/28/37
250.00
3/23/38
250.00
3/24/38
l3/24/38
200.00
6/21/38
200.00
6/21/38
The Security Bank refused to make a loan to petitioner on October 30, 1935, in the amount of $580. On May 15, 1936, petitioner's *245 wife Natalina opened a savings account with the Security Bank with a deposit of $900. Only two withdrawals were made on this account prior to January 1, 1946, at which time there was a balance of $454.79; one withdrawal of $100 was made on May 7, 1937, another of $400 was made on June 21, 1938. Petitioner's two children, Clarence Hawkins, Jr., and Rose Marie Hawkins, also opened savings accounts with the Security Bank on May 15, 1936. Each account was opened with a deposit of $107.50. No withdrawals were made on either account and each showed a balance of $118.41 at January 1, 1946. Also on May 15, 1936, petitioner deposited $260.75 in the Security Bank to the credit of his checking account and paid off a note for $100 to that bank on the same date. On May 27, 1937, which was the same day that $100 was withdrawn from Natalina Hawkins' savings account, petitioner paid a $100 note at the Security Bank, and on June 21, 1938, which was the same day that $400 was withdrawn from Natalina Hawkins' savings account, petitioner paid a $200 note at the Security Bank. On September 22, 1937, petitioner took out a $10,000 life insurance policy on his life with the Prudential Life Insurance Company. *246 The premiums for the first four months were $28.60 each, for the next thirty-two months they were $30.30 each, and for the next sixteen months they were $35.30 each; the total of such payments, which included all payments prior to January 1, 1942, was $1,648.80. On February 24, 1944, petitioner changed this policy to a 10-year payment life policy, requiring, instead of monthly payments, an annual premium of $752.10. On January 18, 1939, petitioner took out a $5,000 policy on his life with the Prudential Life Insurance Company, the premium on which he paid at the monthly rate of $10.75. Prior to January 1, 1942, he made thirty-six payments, or a total of $387. On September 21, 1943, he changed this policy to a 10-year payment life policy, requiring, instead of the monthly payments, an annual premium of $402.53. On February 29, 1940, petitioner purchased a cottage at 2101 Duncan Street, in Louisville, at a cost of $1,050. In this transaction, he assumed a mortgage for $520.64, the terms of which provided for weekly payments of interest of $1.61, and weekly installment payments of $1.38. Petitioner made twenty-six payments of $1.61 and thirty-five payments of $1.38, one payment of $70.76, *247 and a final payment of $396.82, making a total of $557.74. Petitioner filed no Federal income tax returns for the years 1927 to 1939, inclusive. He filed returns for the years 1940 and 1941, on which he reported a net income of $2,638.95 and $3,202.22, respectively. Aside from the claimed deductions indicating outgo, petitioner claimed deductions for depreciation of $420 for 1940, and $870 for 1941. These returns for 1940 and 1941 were prepared by petitioner, with the help of employees at the Bureau of Internal Revenue office. As a part of his 1941 return, there was a sheet attached, prepared by petitioner and in his handwriting, showing a complete listing of the figures on which the return was based, including the computation of depreciation. This sheet of figures, which was the only breakdown showing the source of the total income figure on the face of the return was as follows: "Deductions
"Gas & Light
$ 116.97
Water
56.52
Telephone
138.99
Coal
157.50
Drugs
581.81
Stationery & Stamps
125.55
Dressings & Supplies
183.75
Taxes
181.44
Interest
412.00
Insurance & Donations
129.25
Repairs
226.00
Auto Expense
365.00
Off. Maintenance
78
Help, Cleaning
208
286.00
Dep. Apt.
14,100 33 1/3
423.00
Dep. Cottage
930 25 yrs
27.00
Dep. Auto
800 5 yrs.
3/4 bus.
120.00
Off. Furniture & Equip. Dep.
300.00
$3,830.78
Income from practice
$5,385.00
Income from rent
1,648.00
7,033.00
3,830.78
$3,202.22"
*248 In September 1942, petitioner paid $3,000 for a piece of real estate at 724 South Preston Street, in Louisville, which he sold in October 1944 to Mary E. Spradling for $5,050. Mary Spradling issued a check for $4,050 to petitioner on October 17, 1944, as part payment for the Preston Street property. Petitioner did not deposit the check in the bank, but endorsed it and chased it at a druggist's located near his office. Mary Spradling executed a note for $1,000 for the balance of the purchase price. This note was paid with a check for $1,032, dated July 3, 1945, the additional $32 representing interest. After adjusting petitioner's basis for this property to allow for $143.75 in depreciation previously taken, this sale resulted in a long-term capital gain of $1,096.87. On April 8, 1943, petitioner rented a second safe deposit box, this time at the Security Bank of Louisville, for which he paid an annual rental of $7.50. From the time he acquired the safe deposit box, to August 20, 1946, he made the following entries: June 10, 1943
December 8, 1944
November 24, 1943
January 26, 1945
November 26, 1943
April 6, 1945
January 24, 1944
June 5, 1945
February 17, 1944
February 7, 1946
April 5, 1944
April 18, 1946
April 24, 1944
August 17, 1946
May 23, 1944
August 20, 1946
September 28, 1944
*249 Petitioner did not deposit all of the receipts from his medical practice in the bank during the years in question, nor during the years prior thereto. The purchase of assets and the satisfaction of liabilities duing the taxable years and in the years prior thereto were, in great part, effected by payments in cash. In some transactions and in the purchase of some assets requiring large amounts of money, petitioner would issue a check, but in most instances such checks were issued immediately after he had deposited sufficient cash to cover the cost, or nearly so, of the transaction. On January 24, 1944, petitioner deposited $4,144.50 in his checking account at the Security Bank, of which $3,800 was in cash, giving him a balance of $5,780.04; on the same day a check for $4,853.90 was charged against the account. On October 18, 1944, petitioner deposited $500 in cash plus $556.29 in checks, or a total of $1,056.29. His balance at the time of this deposit was $1,594.86. The next day, October 19, 1944, petitioner purchased a Baldwin piano, for which he issued his personal check on that date for $1,850. On October 23, 1944, petitioner deposited $1,400 in cash plus $49 in checks, making *250 a total of $1,449, and on the next day, October 24, 1944, issued a check which was certified by the Security Bank for $1,000 and charged to petitioner's checking account at that bank. On January 26, 1945, petitioner deposited $1,483.52, of which $500 was in cash, making a balance on that day of $2,154.50. On February 7, 1945, checks in the total amount of $1,526.58 were charged against petitioner's checking account. On July 24, 1945, petitioner deposited $2,600 in cash, plus checks, making a total deposit of $2,898.42. The next day, July 25, 1945, checks totaling $3,483.13 were charged against petitioner's checking account. On or about October 2, 1945, petitioner purchased a brick duplex at 3607 West Market Street, in Louisville, from Floyd Wilson for about $8,400, which he paid for with two certified checks, one in the amount of $5,300 and another for $2,800, plus a small amount of cash. For this purchase, petitioner deposited $8,000 in cash in his checking account at the Security Bank on September 25, 1945, and issued and had certified a check for $8,000 on the same date, payable to Floyd Wilson, in payment for the Market Street property. However, there were two mortgages on the *251 property and the sellers requested payment in two checks, so the certified check for $8,000 was redeposited in petitioner's checking account at the Security Bank on October 1, 1945, and he issued and had certified two checks on the same day, one for $2,800, payable to the Louisville Title Company, agent for Billy M. Dreidell, and the other for $5,300, payable to Floyd Wilson. Deposits made by the petitioner in his Security Bank checking account during the years 1937 to 1945, inclusive were as follows: 1937
$ 4,096.37
1938
4,113.31
1939
3,906.75
1940
5,152.13
1941
4,532.20
1942
6,976.60
1943
8,883.69
1944
15,887.62
1945
* 22,171.40
Petitioner had balances in his checking account at the Security Bank at December 31, 1937 to 1945, inclusive, in the following amounts: 1937
$ 24.18
1938
73.33
1939
93.01
1940
396.80
1941
176.38
1942
$1,017.48
1943
1,524.00
1944
716.25
1945
522.64
Petitioner's accounting records consisted of some unbound ledger sheets, a "daily work book," and an "income book." The record of petitioner's credit patients was *252 kept in the "daily work book" and on the "ledger sheets." The "daily work book" was kept in petitioner's office and he would record in it the names of credit patients and the amount of the fees charged them, as well as the amounts received on account and the names of patients making such payments. From time to time petitioner's wife would take the information from the "daily work book" and transfer it to the ledger sheets, which were the permanent record of petitioner's accounts receivable and which showed the name and address of his credit patients, the total fee charged, the amount and date of any payments made, and the balance due, if any. The only other record kept by petitioner was a black "income book" which consisted of a single total for each month of each year for the years 1942, 1943, 1944 and 1945. This single entry for each month purported to represent the total of cash receipts and accounts received for that period, and the total of all these monthly totals for each of the years in question was the same as the gross receipts in petitioner's returns. No record was retained by the petitioner of cash receipts other than this monthly total, where cash receipts were included *253 with accounts received. Petitioner's income tax returns for each of the years 1942, 1943, 1944 and 1945 were prepared by an accountant. The accountant made no examination of petitioner's books, but made out the returns completely from figures given to him by petitioner. These figures purported to represent petitioner's gross receipts and expenses, and were broken down into various totals which the accountant transferred to the appropriate places on the returns and made the necessary computations to determine petitioner's tax. During the years 1942, 1943, 1944 and 1945 petitioner made payments to life insurance companies as follows: 1942
1943
1944
1945
John HancockLife Ins. Co.
$ 23.76
$ 47.52
$7,466.30
$ 96.90
Metropolitan Life Ins. Co.
197.30
197.30
196.15
193.25
Mutual Benefit Life of N.J.
453.96
453.96
Mutual Benefit Health & Acc.
88.00
88.00
88.00
400.00
New York Life Ins. Co.
76.89
181.17
181.17
557.67
Postal Life & Cas. Co.
3.65
3.65
3.65
3.65
Lloyds
47.40
47.40
47.40
47.40
Commercial Travelers
18.00
44.50
44.00
44.00
Total
$455.00
$609.54
$8,480.63
$1,796.83
During the years 1940 to 1945, inclusive, *254 petitioner made premium payments to the Prudential Life Insurance Company as follows: 1940
$ 512.60
1941
552.60
1942
1,811.70
1943
5,609.86
1944
10,770.15
1945
1,195.70
Total
$20,452.61
At December 31 of the years 1941 through 1945, inclusive, petitioner owned United States bonds as follows: Cost
1941
$ 337.50
1942
2,812.50
1943
6,506.25
1944
17,481.25
1945
28,156.25 Substantial amounts of these bonds were purchased with cash. Petitioner's assets and liabilities, and his net worth at December 31 of each of the years 1941 to 1945, inclusive, were as follows: Total
Total
Net
Year
Assets
Liabilities
Worth
1941
$21,885.06
$6,135.05
$15,750.01
1942
28,214.16
3,478.90
24,735.26
1943
32,465.43
738.97
31,726.46
1944
42,869.18
42,869.18
1945
74,171.07
74,171.07
On December 31, 1941, petitioner did not have a cache of $49,000, or, aside from his bank balance on that date, a cache of any lesser sum. At December 31, 1945, and aside from his bank balance on that date. petitioner had cash on hand of $9,300. Petitioner's increase in net worth for each of the years 1942, 1943, 1944 *255 and 1945, as derived from the figures above, his estimated living expenses, including Federal income taxes paid, and premiums paid on insurance policies were as follows: Increase
Personal and
Premiums
in Net
Living Expenses
on
Year
Worth
Plus Taxes
Insurance
1942
$ 8,985.25
$2,477.41
$ 2,266.70
1943
6,991.20
3,399.68
6,219.40
1944
11,142.72
3,491.59
19,250.78
1945
31,301.89
3,849.29
2,992.53
The cost of the depreciable property owned by petitioner and the details of respondent's determination of petitioner's allowable depreciation during the years involved were as follows: * Used in
Business
Acquired
Cost
75 Per Cent
** Percentage
Office-Apartment Building
3603 West Market Street
9-19-29 (1)
$12,289.94
$9,217.46
3
Remodeling expense
7- 1-33
250.00
187.50
3 1/3
Heating system
7- 1-40
2,050.00
1,537.50
4 1/2
Cottage, 2101 Duncan Street
2-22-40 (2)
750.00
5
Equipment **
1931-35
150.00
10
Equipment
1- 1-37
1,696.50
10
Equipment
7- 1-41
16.50
10 (6 mo.)
Equipment
7- 1-42
13.00
10
Equipment
7- 1-43
51.00
10
Equipment
7- 1-44
60.50
10
Brick Dwelling, Preston Street
9-21-42 (3)
2,500.00
3
Chrysler 1939
7- 1-41
600.00
25
(1) Cost of Office-Apartment Building
Farm traded
$ 3,000.00
Add: Assumed mortgages
9,059.18
$12,059.18
*** Less: Land 27.11 Per Cent
3,269.24
$ 8,789.94
Add: Remodeling expense 1929
3,500.00
Cost of Building
$12,289.94
(2) Cost of Cottage - 2101 Duncan Street
(Feb. 29, 1940)
$ 1,050.00
Less: Value of land
300.00
Cost of Building
$ 750.00
(3) Cost of Brick Dwelling - Preston Street
$ 3,000.00
Land value
500.00
Cost of Building
$ 2,500.00
*256 Allowance for depreciation as recomputed by the respondent and the credit for the long-term capital gain are as follows: Year
Depreciation
Capital Gain
1942
$ 730.16
1943
789.61
1944
770.19
$1,096.87
1945
648.21
*257 The rates allowed by the respondent in recomputing petitioner's depreciation were identical with those claimed by petitioner on his returns, with the exception of the later improvements made on the West Market Street property, for which respondent allowed 22-plus years. Petitioner, in computing his depreciation on his returns for the years 1942, 1943, 1944 and 1945 for the various properties which he owned, made no allowance for the value of land, nor for the personal use of the Market Street building as his residence. The respondent in determining the deficiencies herein arrived at net income for each year by adding personal and living expenses and insurance premiums for each year to the increase in petitioner's net worth for that year and deducting therefrom depreciation, and in 1944 the longterm capital gain. Petitioner's net income so computed and his net income as reported are as follows: Net Income
Year
Net Income
Reported
1942
$12,999.20
$5,332.74
1943
15,820.67
6,654.63
1944
32,018.03
7,190.32
1945
37,495.50
6,806.14
Petitioner filed his Kentucky state income tax returns for the years 1942, 1943, 1944 and 1945 on July 29, 1946; he *258 filed no Kentucky state returns for any year prior to 1942. Petitioner's wife filed no Federal income tax returns for 1914 to 1944, inclusive. The 1945 return involved herein was a joint return of petitioner and his wife. During the years 1942, 1943, 1944 and 1945, as a result of so many doctors having been called into the armed services, there was an extreme shortage of doctors and petitioner could have had all the business he wanted during those years. Neither petitioner nor his wife has ever inherited any money or property or anything of value, nor were they ever the recipients of any substantial gifts of money or property. The petitioner had a daughter and a son, born in 1929 and 1931, respectively, who from the dates of their birth lived with him and for whom he provided all support up to and including the years here in question. The petitioner's books and records were incomplete and inadequate to clearly reflect his income, and respondent correctly determined the unreported net income of petitioner for the taxable years 1942, 1943, 1944 and 1945. Petitioner's income tax returns for each of the years 1942, 1943, 1944 and 1945 were false and fraudulent with intent to *259 evade tax, and a part of the deficiency for each year was due to fraud with intent to evade tax. Opinion Section 41 of the Internal Revenue Code of 1939 provides that the "net income shall be computed upon the basis of the taxpayer's annual accounting period * * * in accordance with the method of accounting regularly employed in keeping the books of such taxpayer; but if no method of accounting has been so employed, or if the method employed does not clearly reflect the income, the computation shall be made in accordance with such method as in the opinion of the Commissioner does clearly reflect the income." Petitioner contends that his records were correct, adequate and clearly reflected his income, and that the respondent erred in using the increase in net worth and expenditure method to compute his net income. The net worth method of computing net income is not a system of accounting, and respondent is thus not foreclosed by section 41, supra, from using that method. Estate of George L. Cury, 23 T.C. 305. When the increase in net worth is greater than the income reported by the taxpayer on his returns and is inconsistent with the books and records maintained *260 by him, it is cogent evidence, in the absence of a showing of gifts or inheritances or other nontaxable receipts, that there is unreported income, or that the books and records are inadequate, inaccurate or false. Morris Lipsitz, 21 TC 917; Estate of W. D. Bartlett, 22 TC 1228; H. A. Hurley, 22 TC 1256; and Estate of George L. Cury, supra.The net worth computation in the instant case indicates a net income 243.76 per cent greater than that reported in 1942; 237.73 percent greater than that reported in 1943; 445.29 per cent greater than that reported in 1944, and 550.90 per cent greater than that reported in 1945. Such evidence, together with the meager record of cash receipts kept by the petitioner and the disposal by him of his only supporting record of such receipts, is sufficient to justify respondent's action in resorting to the net worth method. Except for the amounts of cash on hand on January 1, 1942, and December 31, 1945, the assets of petitioner for the years in question are not in dispute, and were as shown in the respondent's net worth determination. Neither is there any dispute as to liabilities, which likewise were *261 as determined by respondent. Petitioner has stipulated to all of his insurance payments, except those made to the Prudential Life Insurance Company, and records of that company fully and clearly sustain the respondent with respect to those payments. Respondent estimated petitioner's living expenses at $2,400 for each year, which, considering the size of petitioner's family and their style and character of living, is reasonable, and petitioner does not contend otherwise. Petitioner contends that he had $49,000 other than bank deposits at the beginning of the taxable period, January 1, 1942, and that he had no cash other than bank deposits at the end of the taxable period, December 31, 1945. Respondent contends that, with the exception of bank deposits, petitioner had no cash at the beginning of the taxable period, and had $9,300 at the close of the taxable period. It is petitioner's claim that in 1927, when he liquidated all of his assets in Michigan preparatory to moving to Louisville, he had, together with savings he had accrued while there, $25,000, which he put in a metal fishing tackle box and carried with him to Louisville. He further contends that during the years 1927 to *262 1941, inclusive, he was able to set aside another $24,000, which he also put in the fishing tackle box, or, for such periods as he had one, in a safe deposit box at the Kentucky Trust Company. The record not only does not support these contentions of petitioner, but rather, refutes them. We are not convinced from the evidence that petitioner accumulated any cash after 1927, when he went to Louisville, and prior to 1942. Furthermore, we are convinced that such savings as he did have when he left Michigan, except as may be reflected in the determined net worth, were exhausted long before the end of 1941. His financial history between 1927 and the end of 1941, as shown of record, is not consistent with his claim of an initial $25,000 in cash and a program of saving which would have had to average in excess of $1,700 a year. His repeated use of small loans during this period, many of which were renewed several times, apparently from necessity, his petty borrowing on his insurance policies and allowing the interest payments thereon to accumulate, as well as having to borrow on these policies to pay the premiums, his delinquency in meeting the mortgage payments on the Market Street property, *263 and his refinancing of that mortgage through the HOLC at a time when the Louisville Trust Company was threatening to foreclose for nonpayment of his mortgage loan with it, are all facts which are contradictory of a savings program during that period. One explanation offered by petitioner of the impecuniosity indicated by his financial transactions from 1927 to 1941 was that he was suffering from tuberculosis throughout this period, did not know at what time his health might break altogether, and for that reason, he was trying to get along on his current income and avoided any invasion of his savings. Aside from the fact that this explanation would not account for the $24,000 of additional savings claimed for the period, the record as we read it does not support a picture of petitioner as a particularly frugal type of individual, but rather, that when he had money he spent it. And as for his health, it was sufficiently good to permit him to take out additional life insurance, $10,000 in 1937 and $5,000 in 1939, and there is no suggestion or claim that the premiums were "rated up" because of his health. Further, we do not note that there had been any great reluctance on the part of *264 the petitioner to make comparatively substantial cash outlays during the 1920's and 1940's in spite of his health. Thus, in 1924, when his tubercular condition was seemingly in its most critical stage, and at about the time of the "boom," he speculated $4,000 to $5,000 in Florida real estate; in 1927 he purchased a new Buick convertible coupe, which cost him $2,400; and in 1926 or 1927, he purchased his family's Indiana farm from his brother and sister for $3,000, paying $1,500 to each. From 1928 until 1942, however, petitioner made no purchases which required any substantial outlay of cash, but, on the contrary, with the exception of the last few years during that period, made all purchases on a credit basis, the payments for which, it appears, he had as much difficulty maintaining as he did the small loans which he borrowed during that same period. Yet, during the four years beginning with 1942 he expended in excess of $64,000, not including his living expenses or $19,387.41 which he paid to the Prudential Life Insurance Company for insurance. Moreover, one of petitioner's contentions before this Court, contrary to respondent's determination, is that he expended all of his cash prior *265 to December 31, 1945. Such facts, we think, dispel any aura of frugality for the period prior to 1942 which petitioner has attempted to create. We are not convinced that at December 31, 1941, petitioner had a cache of $49,000, or, aside from his bank balance on that date, a cache of any lesser sum. We do have his testimony that he did have that amount of money in a fishing tackle box at that time, but that testimony we find incredible and are unable to reconcile it with other evidence we do believe. It is accordingly our conclusion that the respondent was justified in determining that petitioner's cash on hand at the end of 1941 was limited to his bank balance, and we have so found. With respect to the closing cash amount of $9,300 at December 31, 1945, as determined by respondent, the inclusion is based upon a purported admission by petitioner to the revenue agent at his office that he had this amount in cash in his safe deposit box at the Security Bank at December 31, 1945. Petitioner denies having made any such admission. According to the revenue agent, he and petitioner inventoried the safe deposit box on August 20, 1946, and there was $1,400 in cash in the box at that time; *266 petitioner explained the difference between the $9,300 and the $1,400 at that time by advising the revenue agent that he had loaned money to two people on mortgages. In the course of petitioner's testimony, he admitted that he recalled a visit with the revenue agent to the safe deposit box on August 20, 1946, and that there was $1,400 in the box at that time. He further admitted that he had made loans to persons by the names of Watts and Whaler in 1946, in the respective amounts of $2,200 and $5,700. Dorothy Watts testified that she borrowed $2,200 from the petitioner in 1945 or 1946, and that she thought he gave it to her in cash. Petitioner entered his safe deposit box at the Security Bank on April 18, 1946, and on the same day made a deposit of cash of $5,700 in his account at that bank, which was the identical amount he admitted having loaned Whaler. Petitioner made only three entries to his safe deposit box at the Security Bank prior to August 20, 1946, when he was accompanied by the revenue agent; those dates were February 7, 1946, April 18, 1946, and August 17, 1946. Such being the state of the record, it is our conclusion that petitioner has not borne his burden of proof on *267 this issue, and the determination of the respondent is sustained. Petitioner also cites as error respondent's recomputation of his depreciation. On his returns for the years in question, petitioner made no allowance for the value of land in connection with his various properties, nor did he make any allowance, in computing his depreciation on the Market Street property, for the use he made of it as a residence. Respondent's recomputation takes these factors into consideration. Petitioner has made no attempt to recompute his depreciation, merely charging that respondent has estimated the life of his properties to be greater than they really were, thus reducing the effective rates thereon. We have set forth in our findings of fact respondent's schedule of petitioner's properties upon which he based his determination, and have carefully reviewed it in the light of the evidence. We find it to be reasonable, and in the absence of any showing to the contrary by petitioner, sustain the respondent's determination with respect thereto. The respondent has determined that at least a part of the deficiency for each of the taxable years was due to fraud with intent to evade tax. We think that *268 he has sustained his burden of proof in establishing such fraud. What we have said above concerning petitioner's testimony regarding accumulations of cash applies equally here. This specious explanation to account for his large expenditures during the taxable years, the large degree to which he dealt in cash, together with the almost total lack of records of cash receipts, and the substantial amounts of unreported income, during the years in question, in our opinion, denote a clear intent to evade tax, and we have so found as a fact. Having sustained the respondent's determination that at least a part of the deficiency for each of the years 1942, 1943, 1944 and 1945 was due to fraud with intent to evade tax, the issue raised regarding the statute of limitations under section 276(a) of the 1939 Code becomes moot, since in case of fraud there is no period of limitation against respondent. Decision will be entered for the respondent. Footnotes
1. The deficiency for 1943 subject to addition for fraud is $3,380.57; $165.81 of the total deficiency assessed represents an uncollected balance resulting from a recomputation of the 1942 tax forgiveness feature.↩
*. 1945 total does not include the $8,000 redeposited on October 1, 1945.↩
*. Petitioner used 1/4 (25 per cent) of his office-apartment building, plus additions, at 3603 West Market Street as his residence. Therefore, 25 per cent of the depreciation thereon would not be allowable as a business deduction. ↩
**. The cost of the equipment is arrived at by process of the examining agent inspecting and inventorying all equipment in the petitioner's medical office and after discussions with the petitioner as to what he paid for the equipment. The equipment which petitioner had on hand from 1931 to 1935 was so old that it was depreciated out by December 31, 1941. ↩
***. The office-apartment building was assessed for City of Louisville property taxes in 1929 at $1,860 for the land and $5,000 for the improvements which was a ratio of land to total assessment of 27.11 per cent. File No. 1598 of the Louisville Trust Company relative to the mortgage loan on 3603 West Market Street reveals an appraisal of that property at September 2, 1930, with a value for the land of $4,155 and for the improvements of $10,600.↩